## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------------X

In re: TW, INC., f/k/a Cablevision Electronics Investments, Inc.,

                              Debtor.

Chapter 11

-----------------------------------------------------------------------X

Case No. 03-10785 (MFW)

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF TW, INC. f/k/a CABLEVISION
ELECTRONICS INVESTMENTS, INC.,

                         Plaintiff,

                  --against--

Adv. Proc. No. 05-50585 (MFW)

CABLEVISION SYSTEMS CORPORATION, CSC HOLDINGS,
INC., CABLEVISION ADVERTISING SALES, CABLEVISION
INTEGRATED SALES, CABLEVISION LIGHTPATH, INC., FOX
CABLE NETWORKS, INC., f/k/a FOX SPORTS NETWORKS,
LLC a/k/a FOX SPORTS NET, MADISON SQUARE GARDEN,
L.P., METRO CHANNEL, LLC d/b/a METROCHANNELS,
RAINBOW ADVERTISING SALES CORPORATION, RAINBOW
MEDIA HOLDINGS, LLC, AND REGIONAL PROGRAMMING
PARTNERS, CHARLES F. DOLAN, JAMES L. DOLAN,
WILLIAM J. BELL, ANDREW B. ROSENGARD, THE ESTATE
OF MARC A. LUSGARTEN, ROBERT S. LEMLE, WILLIAM
MARGINSON, HANK J. RATNER, NORMAN GOLDBERG and
JEFFREY YAPP,

                  Defendants.

Regarding Docket No. 200

-----------------------------------------------------------------------X

## NOTICE OF APPEAL

Appellant, the Official Committee of Unsecured Creditors of TW, Inc. f/k/a Cablevision

Electronic Investments, Inc. (the "Committee"), by its undersigned co-counsel, Ballard Spahr

Andrews & Ingersoll, LLP and Hahn & Hessen LLP, appeals, pursuant to 28 U.S.C. § 158(a)(1)

and Rule 8001 of the Federal Rules of Bankruptcy Procedure, to the United States District Court

for the District of Delaware (the "District Court") from that portion of the order (the "Order") of

the United States Bankruptcy Court for the District of Delaware (Hon. Mary F. Walrath) (the

"Court") dated April 1, 2008 and entered on April 4, 2008 (Docket No. 200), in which (and for

the reasons stated on the record at the November 29-30, 2007 trial (the "Insolvency Trial")) the

Bankruptcy Court found that TW, Inc. f/k/a Cablevision Electronics Investments, Inc. (the

"Debtor"):

      1.     "was operating, and for solvency purposes, should be valued, as a going concern at all times during the period from February 9, 1998 through and including December 31, 2002"; and

      2.     "was solvent during the period from February 9, 1998 through and including December 31, 2002."

A copy of the Order is attached hereto as Exhibit A, and a copy of the relevant excerpts of the transcript of the Insolvency Trial is annexed hereto as Exhibit B.

Appellant respectfully submits that, among other things:

1.     the Bankruptcy Court erred in finding that the Debtor should be treated as a going concern for insolvency purposes during the period from February 9, 1998 through and including December 31, 2002;

2.     even assuming that the Bankruptcy Court did not err in finding that the Debtor should be treated as a going concern for insolvency purposes, the Bankruptcy Court nevertheless erred in finding that the Debtor was solvent during the period from February 9, 1998 through and including December 31, 2002;

3.     the Bankruptcy Court erred in finding that the Debtor was able to satisfy its debts as they came due during the period from February 9, 1998 through and including December 31, 2002; and

4.     the Bankruptcy Court erred in finding that the Debtor was adequately capitalized during the period from February 9, 1998 through and including December 31, 2002.

The Order is final and appealable pursuant to 28 U.S.C. § 158(a)(1) because (a) it affects the assets in the Debtor's bankruptcy estate; (b) the District Court need not make any additional findings of facts to decide this appeal; (c) a decision by the District Court would have a preclusive effect on further litigation with respect to the issues on appeal; and (d) hearing the appeal would further judicial economy.

The names of all parties to the Order appealed from and the names, addresses, and telephone numbers of their respective attorneys are as follows:

**APPELLANT:** The Official Committee of Unsecured Creditors of TW, Inc.,
f/k/a Cablevision Electronics, Inc.

Hahn & Hessen LLP
Appellant's Counsel
488 Madison Avenue
New York, New York 10022
Telephone:    (212) 478-7200
Facsimile:    (212) 478-7400
Attention:    Steven J. Mandelsberg, Esq.

Ballard Spahr Andrews & Ingersoll, LLP
Appellant's Counsel
919 North Market Street, 12th Floor
Wilmington, Delaware 19801
Telephone:    (302) 252-4465
Facsimile:    (302) 252-4466
Attention:    Tobey M. Daluz, Esq.

**APPELLEES:** Cablevision Systems Corporation, CSC Holdings, Inc., Cablevision Advertising
Sales, Cablevision Integrated Sales, Cablevision Lightpath, Inc., Fox Cable
Networks, Inc., f/k/a Fox Sports Networks, LLC a/k/a Fox Sports Net, Madison
Square Garden, L.P., Metro Channel, LLC d/b/a Metrochannels, Rainbow
Advertising Sales Corporation, Rainbow Media Holdings, LLC, and Regional
Programming Partners, Charles F. Dolan, James L. Dolan, William J. Bell,
Andrew B. Rosengard, The Estate of Marc A. Lusgarten, Robert S. Lemle,
William Marginson, Hank J. Ratner, Norman Goldberg and Jeffrey Yapp

Duane Morris LLP
Appellees' Counsel
1100 North Market Street, Suite 1200
Wilmington, DE 19801
Telephone:    (302) 657-4900
Facsimile:    (302) 657-4901
Attention:    Richard W. Riley, Esq.

Paul, Hastings, Janofsky & Walker, LLP
Appellees' Counsel
191 N. Wacker, 30th Floor
Chicago, IL 60606
Telephone:    (312) 499-6000
Facsimile:    (312) 499-6100
Attention:    Paul E. Harner, Esq.

Quinn Emanuel Urguhart Oliver & Hedges LLP
Appellees' Counsel
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:    (212) 849-7000
Facsimile:    (212) 849-7100
Attention:    Richard I. Werder, Jr., Esq.

Dated: Wilmington, Delaware
       April 11, 2008

Respectfully submitted,

/s/ Tobey M. Daluz
Tobey M. Daluz, Esquire (No. 3939)
Katie A. D'Emilio, Esquire (No. 4824)
BALLARD SPAHR ANDREWS & INGERSOLL, LLP
919 N. Market Street, 12th Floor
Wilmington, DE 19801
Telephone: (302) 252-4465
Facsimile: (302) 252-4466
Email: daluzt@ballardspahr.com
       demiliok@ballardspahr.com

HAHN & HESSEN LLP
Steven J. Mandelsberg, Esq.
Mark T. Power, Esq.
Robert J. Malatak, Esq.
488 Madison Avenue
New York, New York 10022
Telephone:    (212) 478-7200

# Exhibit A

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| TW, Inc. f/k/a Cablevision Electronics Investments, Inc., | : | Case No. 03-10785 (MFW) |
| Debtor. | : | |
| The Official Committee of Unsecured Creditors of TW, Inc. f/k/a Cablevision Electronics Investments, Inc., | : | Adv. Pro. No. 05-50585 (MFW) |
| Plaintiff, | : | |
| v. | : | |
| Cablevision Systems Corporation, *et al.*, | : | |
| Defendants. | : | |

### ORDER

The Court having held a trial on November 29-30, 2007 (the "Insolvency Trial") on the "Insolvency Issue" (as defined in the Third Amended Scheduling Order entered on April 24, 2007 at docket number 157 (the "Third Amended Scheduling Order")), and having considered the evidence presented at the Insolvency Trial, and having heard argument from counsel, and after due deliberation, for the reasons stated on the record at the Insolvency Trial, the transcript of the proceedings of which are hereby incorporated by reference as the Court's findings of fact and conclusions of law,

IT IS HEREBY FOUND THAT:

1.    TW, Inc. f/k/a/ Cablevision Electronics Investments, Inc. (the "Debtor") was operating, and for solvency purposes, should be valued, as a going concern at all times during the period from February 9, 1998 through and including December 31, 2002.

2.    The Debtor is deemed to have been solvent during the period from February 9,

1998 through and including December 31, 2002.

3.    The Debtor is deemed to have been insolvent for the period from January 1, 2003

through and including March 14, 2003.

4.    A trial on the "Recharacterization Issue" (as defined in the Third Amended

Scheduling Order) is continued to a date to be determined by the Court. A status hearing
will be held on April 21, 2008 at 10:30 am.

5.    The Court shall retain jurisdiction to hear and determine all matters arising from

implementation of this Order.

Dated: March ___, 2008
        Wilmington, Delaware

                            The Honorable Mary F. Walrath
                            Chief United States Bankruptcy Judge

2

# Exhibit B

THE COURT:  Good morning.

ALL:  Good morning, Your Honor.

THE COURT:  I believe the Plaintiff had rested.

MR. MANDELSBERG:  Good morning, Your Honor, Steven
Mandelsberg from Hahn & Hessen, counsel for the Plaintiff in
this action.  With me today is Rob Malatak and Toby Daluz.

Your Honor, before Defendant's case begins we'd just like
to offer into evidence all of the Plaintiff's trial exhibits
which have been submitted to the Court.  I believe there --
other than the objection to P-71 and 71(A) parties have
resolved objections to all of the Plaintiff's exhibits, except
for one, and that's P-47, which is a 1998 Congress financial
borrowing certificate.  And we submit that that should be
received in evidence in light of the testimony yesterday.  And
the only B

(Plaintiff=s Exhibit-47 previously marked for
identification)

THE COURT:  Well, let's hear what the objection is.

MR. MANDELSBERG:  Sure.

MR. WERDER:  Withdrawn, Your Honor, the objection to
Exhibit-47, withdrawn.

THE COURT:  All right, then that will be admitted.

(Plaintiff=s Exhibit-1 admitted into evidence)

(Plaintiff=s Exhibit-2 admitted into evidence)

(Plaintiff=s Exhibit-3 admitted into evidence)

(Plaintiff=s Exhibit-9 admitted into evidence)

(Plaintiff=s Exhibit-10 admitted into evidence)

(Plaintiff=s Exhibit-11 admitted into evidence)

(Plaintiff=s Exhibit-12 admitted into evidence)

(Plaintiff=s Exhibit-13 admitted into evidence)

(Plaintiff=s Exhibit-14 admitted into evidence)

(Plaintiff=s Exhibit-15 admitted into evidence)

(Plaintiff=s Exhibit-16 admitted into evidence)

(Plaintiff=s Exhibit-18 admitted into evidence)

(Plaintiff=s Exhibit-47 admitted into evidence)

(Plaintiff=s Exhibit-69 admitted into evidence)

MR. MANDELSBERG:  And the only other matter for
housekeeping purposes, if anything else, are both parties have
submitted various deposition designations.  Plaintiff has
submitted its own, Defendant's have submitted its own.
Plaintiff has submitted a -- it's in appendix-A so it=s
pretrial memo, a chart outline of what we think are the
relevant deposition designations.  Parties have not -- well,
they've tried, they've not been able to resolve the objections.
And I suggest perhaps rather than wasting time on argument
today that that can either be resolved or addressed at any post
trial, post hearing submissions.

THE COURT:  All right.  Any other suggestion on that?

MR. WERDER:  Your Honor, Rick Werder from Quinn
Emanuel for the Defendants.  We would withdraw all of our

objections in exchange for them withdrawing all of their
objections and let all of the proper deposition testimony be
submitted to the Court.

MR. MANDELSBERG:   Your Honor, that's fine.  We have
no problem, and so all the deposition designations can go in.
I believe that the Court has copies of all the transcripts --

THE COURT:   I do.

MR. MANDELSBERG:   -- not just the excerpts.  But if
there are any -- if the Court doesn't have them we'll of course
submit them.

THE COURT:   Well, from the ones I've reviewed so far
it looks I have the entire transcripts, so --

MR. MANDELSBERG:   Very well.

THE COURT:   All right.

MR. MANDELSBERG:   Thank you, Your Honor.

THE COURT:   All right, Defendant wish to proceed?

MR. WERDER:   Good morning, Your Honor, Rick Werder
again from Quinn Emanuel.  We have a motion at this time, Your
Honor, for -- on the issue of solvency for judgment in our
favor for all periods of time outside of the statutory
presumptive insolvency period for 90 days prior to the
bankruptcy filing.

I'll be brief.  The Plaintiff has rested. The only
evidence of insolvency that they've offered is the opinion of
Mr. Lenhart.  Mr. Lenhart's opinion made clear both by his

testimony yesterday and his report is based upon a valuation of CEI as a failing concern, not a going concern. I think the testimony and the report both make perfectly clear that this is a key to Mr. Lenhart's valuation and is outcome determinative.

          .    Demonstrative Exhibit-2, which was discussed yesterday, shows the various adjustments that were made to the balance sheet of CEI on the basis of Mr. Lenhart's approach to the business -- to the valuation as a failing concern valuation. And I think just looking at the adjustments that are made, in particular the lease termination adjustment of hundreds of millions of dollars, which is obviously designed to swamp the company from the day that Cablevision bought it, makes clear that that is outcome determinative.

          His opinion as made clear both in his report and his testimony yesterday is that CEI was not a going concern from 1998 on. Yesterday he testified that it became not a going concern at some point in 1998. I believe in his report there's an indication that the report period applies to the entirety of the period from Cablevision's purchase in February of 1998 on.

          It is unclear to me what -- to us what legal or financial standard Mr. Lenhart is applying to reach his conclusion that CEI was not a going concern, but it is not a standard whatever it is that reflects the governing law in this Court and in this Circuit. The case law in this Court and this Circuit makes clear that companies are to be valued as going concern. It is

a very low threshold in determining whether a company should be
valued as a going concern.  And I think the standard is
articulated that in order to be valued as a liquidating or
failing concern the company must be wholly inoperative or
defunct.  If the company is actively engaged in business, if
liquidation is not clearly eminent, if the company plans to
continue in business as usual it must be valued as a going
concern.  And we would cite your <u>Lids</u> decision on that
proposition.  Also we would cite Judge Carey's decision in
<u>American Classic</u>, both of which stand for that proposition.

    Courts in this Circuit and in this Court in particular and
other Courts routinely consider events after the valuation date
in determining whether a company was a going concern on the
valuation date.  For that we cite not this -- not your, but
this Court's decision in <u>Heckinger Investment Company of
Delaware</u>, which is at 327 BR 537.  That Court says, among other
things, {quote}, after citing the analytical standard that I
just set forward, "With this analytical framework in mind the
Court concludes first that bankruptcy was not clearly eminent
in September 1997 as it cannot be disputed that Heckinger
continued to operate and to satisfy all of its obligations to
its Creditor constituency for well over a year subsequent to
the transaction"  And there are a variety of other cases also
standing for that proposition.

    Under the controlling legal standard, Your Honor, it's

necessary to value CEI as a going concern. Plaintiff has
chosen not to do so. In our view they've chosen not to do so
for tactical reasons, based largely on the desire to swamp the
entity with the massive future leasehold obligations. Because
of their strategic choice they have not presented any evidence
to satisfy the burden of proof of insolvency for any periods
outside of the period of time covered by the statutory
presumption.

Separately, the whole analysis that Mr. Lenhart has
presented is premised on the lack of a binding legal commitment
by Cablevision to fund CEI. This relates particularly to his
application of the adequacy of capitalization test and to his
application of the ability to pay debts when they came due
test. Mr. Lenhart assigns zero probability to continued
funding by Cablevision because of the absence of a binding
legal commitment. He discounts Cablevision's massive ongoing
funding of this entity to zero. For this reason, despite the
fact that it was a strategic acquisition, despite the fact that
there were budgets submitted on an annual basis and approved on
an annual basis, despite the fact they were making very
substantial tens of millions of dollars of capital expenditures
with Cablevision's approval, despite the fact that Cablevision
provided over $500 million of advances in actual funding during
the testing period that Mr. Lenhart covers, and despite the
absence of any contemporaneous statement that was inconsistent

with a continued willingness to fund.

We would cite this Court's decision, again -- this
Bankruptcy Court's decision, not Your Honor's decision, in the
Montgomery Wards case. That case, just to quickly summarize
the facts, it's not a solvency decision per se, but it is a
decision were the Court was very interested in the financial
condition of Montgomery Wards, which after its first bankruptcy
was a wholly owned subsidiary of General Electric. As a wholly
owned subsidiary of General Electric, General Electric was
supporting Montgomery Wards as a wholly owned subsidiary
without any binding legal commitment to do so.

The Court's opinion in the case makes clear that
Montgomery Wards' projections of its continued viability
depended upon its ability to access funding and -- from General
Electric. Montgomery Wards' clean audit opinion. The Court's
opinion makes clear also depended on GE's financial support.
And the Court's opinion makes clear that there was no binding
commitment by GE to continue that funding, and in fact there
was testimony in the case that to the affect that
{quote}, "GE's willingness to provide support was not set in
stone," {close quote}.

Again, it's not a solvency case per se, but it does make
clear that parent financial support is relevant despite the
fact that it's not given pursuant to a binding financial -- a
binding legal obligation.

And I would submit, Your Honor, that the proposition that
a parent corporation that is supporting a wholly owned
subsidiary in massive ways such as were being done here, on an
ongoing basis with substantial cash infusions, the proposition
that such a parent needs to treat a subsidiary as insolvent
because the advances aren't made pursuant to a binding legal
commitment would be a startling novel and unsupported
proposition, and it's a proposition that would have huge and
potentially very adverse consequences for corporate America.

Despite Mr. Lenhart's testimony that he's experienced with
situations where parent support is provided pursuant to a
binding contract, I feel quite certain that this Court has seen
many, many situations where parent support is not provided
pursuant to any sort of a binding contractual commitment.  I
think, in my experience at least, and I think the Court can
take judicial notice, that it is a standard way of doing
business in America to support subsidiaries without binding
commitments to do so.

So I think the proposition that Mr. Lenhart is basing his
approach on not only finds no support that we can determine in
any case law, but it is a proposition that would have
substantial adverse impact on financial affairs in American
corporations.

Thank you, Your Honor.

THE COURT:  Thank you.  Response?

       MR. MANDELSBERG:  Your Honor, we believe that
Defendant's Motion for Judgment should be denied in all
respects for the following reasons.  First and foremost,
Plaintiff has submitted a pretrial memorandum on November 9th.
 Defendants have submitted no memorandum at all, and except for
Mr. Werder's reference today it's the first time they've
addressed any of the legal standards dealing with either the
insolvency or recharacterization issues in this case.
Nonetheless --

       THE COURT:  But you're aware of the standards?

       MR. MANDELSBERG:  We're aware of the standards, and
we think we've met them.  Your Honor, we believe that Plaintiff
has, through Mr. Lenhart's testimony and the documents and
deposition testimony established that CEI was insolvent during
the relevant period, and that CEI was a failing concern.

    The predicates for the Dismissal Motion seem to be to
emphasize that the funding relationship between the parties
should have been taken in consideration, number one.  And
number two, that the fact that the companies -- that CEI, the
Whiz, was open for business and in fact operated that negates
the inference that it's a failed concern.  Number three, that
the -- there needs to be, or that Plaintiff is saying that
there needs to be a written, binding commitment in order for
there to be a solvency, or insolvency finding.  And number
four, that were the Court to find CEI insolvent it would be

doing something dramatically unorthodox and inconsistent with precedent and the sending a clarion call to all that would disrupt parent subsidiary relationships in the future.

We believe each of those predicates is flawed. First of all, Your Honor, the. -- Mr. Lenhart's qualifications were unchallenged, and his experience was unchallenged. And given the clear law in this Circuit and elsewhere that solvency analyses are not supposed to be done retrospectively or -- but the principles of retrojection. Mr. Lenhart's analysis properly considered each of the periods of time in the company's performance in determining whether or not it was a failing concern or going concern.

As to the funding predicate in opening business predicates, our brief cites a variety of authorities for the proposition that you're not supposed to consider parent subsidiary relationships, but rather supposed to analyze the solvency of the separately organized entity. Unless there are circumstances to do otherwise. There weren't any.

THE COURT:  Well, that does not mean ignore what was happening.  I think those cases simply say you cannot consider the solvency of the parent standing alone in determining that the sub is solvent or insolvent.

MR. MANDELSBERG:  That's correct.  And -- but that's why Mr. Lenhart did his analysis on a stand alone basis.  He didn't consider CSC.  Mr. Lenhart, contrary to Mr. Werder's

suppositions, did not ignore the funding by CSC.  He just
evaluated at points in time whether or not, as is proper under
the standard in this Court, it was known or knowable,
reasonably knowable to continue.  And although Mr. Werder cites
the <u>Montgomery Ward</u> case, which didn't involve a solvency
analysis, the case law that's most or more applicable in this
case is the <u>Doctor=s Hospital</u> case and the <u>RML</u> case, but
particularly the <u>Doctor's Hospital</u> case that we discuss in page
11 of our pretrial memo.

     That case, which was decided by the Bankruptcy Court in
Illinois in 2007 involved a situation like here where an expert
testified and found a Doctor's Hospital of Hyde Park, Inc. to
be solvent after adding $18 million to the company's fair value
of equity for the fiscal, -- for two fiscal years.  On the
assumption that a certain principal doctor, who was the sole
shareholder, stood ready to contribute those sums to the
hospital cash flow in those years, even though he had not done
so.

     The Court was assessing whether or not an expectation of
continued funding because of prior funding, what that amounts
to.  What -- how is the Court supposed to assess that where
there's been prior funding?  And in the portion we quote, which
we think is directly relevant to this case, the Court found
that the assumed contributions could not properly be considered
in insolvency analysis because there was no evidence, and I'm

quoting from page 860 of the opinion, referred to at page 11 of
our pretrial memo, "because there was no evidence that Deznic"
-- he's the name of the sole shareholder -- "had an obligation
to make any such contribution to Doctor's Hospital.  He was the
hospital's sole shareholder, but that did not transform him
into a source of contingent payments.  For contingent payments
to exist there must be some circumstances under which Doctor's
Hospital would have a right to the payments.  In 1997 and 1998
no such circumstances existed.  At some point an owner may
determine that further capital contributions are not in its
best interests -- in his best interests.  There was no reason
to assume absolutely that a punitive investor would assume that
Deznic would make contributions in the years in issue."

    And that really is -- turns -- leads me to turn to the
third predicate of the Defendant's motion, and that is the
constant emphasis on the supposed fact that you need to have a
-- or that Plaintiff is saying that you must have only a
legally binding enforceable commitment in order for this Court
to conclude that there would be an insolvency or solvency
determination.  The evidence which is undisputed is far broader
than that.  It's not simply that Defendants in this case have
consistently stated that there was no commitment to provide
further funding throughout the relevant period.  It's not
simply that Mr. Werder himself has made that statement.  It's
far more pertinent, although I realize they want to hang their

hat on the commitment, is what they said about the nature of
the funding.

They have said, and they don't dispute this, that it was
solely discretionary, that it was terminable at any time, that
the mere fact that prior funding was given did not give rise to
any obligation to continue further funding.  That the
management representation letters on which some reliance was
placed by Defendants do not mean simply because they used the
words present intention and ability to provide continuing
economic support to CEI until it becomes self supporting and
profitable events, which admittedly never occurred, does not
mean that there was any obligation to provide such support for
12 months, 2 months, 3 months or one day after the date in the
letter.  And there's no dispute that all of this testimony was
on behalf of representatives with knowledge, with senior
authority, binding Defendants, people who knew, supposedly,
what they were talking about.

Now on that record Mr. Lenhart appropriately evaluated in
accordance with the standard what you could find, or how you
could quantify or determine whether funding in any period of
time was known or knowable.  And he didn't just rely on those
statements.  He looked based on his experience to what else was
there.  Yes, there were capital budgets and capital
expenditures.  But there were also budgets that showed that the
company kept losing money and needed far more expenses than

they projected.

He looked at whether or not there was anything besides the
Cablevision statements that he could -- or a Court could hang
its hat on as to what would reasonably give any indication that
this funding would continue. Was there a binding agreement?.
No. There were guarantees issued to -- and letters of credit
issued to third parties. But there were none issued to CEI.
Was there any change in the management representation language
from year to year? Was there any change in the footnote to the
financial statements that were audited every year? Was there
an indication in any of the management representation letters,
for example, that in addition to saying there was a continuing
economic support, was there a pledge that that support would
not be terminated for any period of time? The answers to all
these questions were all in the negative at all periods of
time.

So Mr. Lenhart, and we believe it's appropriate for him to
conclude this way, Mr. Lenhart concluded that there was no way
that you would reasonably know what funding would continue from
year-to-year, day-to-day, or otherwise. And he went further
than that. He assumed that even if, as he testified yesterday,
even if you considered that this was a going concern what sort
of going concern could it be? How could it be valued? His
testimony yesterday clearly indicated, clearly established that
a going concern that's worth zero or worthless isn't a going

concern.

In any event I don't think either party disputes that absent the continued funding of CSC, CEI was out of business. There were -- there's abundant testimony in the deposition references to that affect. Mr. Vere stated so, Mr. Bell stated so. Other parties stated so. So this wasn't a situation as in some other cases that the Court has seen where there is a possibility of the company continuing in business.

Nor is this a situation, Your Honor, in which there were irregularities or peaks and valleys in CEI's profitability or performance. They were uninterruptedly negative. Negative EBITDA, negative cash flow, no profits except for one month, I believe, in 1998. So there's nothing here for the Court to say, well, if I put aside the funding then you could look at this and say that it wasn't a failing concern. It was entirely appropriate under the law for Mr. Lenhart to evaluate whether or not this funding was known or reasonably knowable.

And even if there was a pseudo commitment or whether there was a commitment the 3rd Circuit case with which I know Your Honor is well familiar of RML, clearly, and that's discussed at page -- beginning at page 10 of our pretrial memo, clearly sets forth the standard where even there -- when there is a commitment letter issued by a lender, even in those circumstances the Court is supposed to evaluate the commitment letter and evaluate at a point of time whether or not

conditions in the commitment letter are likely to occur.

So even in the commitment letter situation the -- this Circuit has held that what is supposed to happen is not blindly accepting the commitment, but to evaluate where -- whether it's reasonable. . And whether it's worth something.

Mr. Lenhart performed multiple analyses to reach his conclusions. All of these conclusions are well supported by the documents. He vetted his conclusions with cross validation steps. He considered Mr. Mandorino's analysis and where it was flawed. He even made adjustments to Mr. Mandorino's analysis to show that it would have been insolvent under his numbers.

And as for the final predicate of Defendant's motion that if the Court were to find CEI solvent -- insolvent for any period other than the 90 days before the filing, it would be doing something dramatic or unorthodox. We strongly disagree. We pointed out starting at page 33 of our pretrial memo why we think that's the case. But just to summarize, what Defendant's argument in our view really amounts to is playing games with the issue of capitalization. CEI was never really capitalized. What happened here is that CEI in the stipulation of facts that Your Honor has admits this, that CEI was really just given money enough to pay its debts after they had been incurred. Or as they were incurred. They didn't have any investment at the beginning of any period that was measured out in any way.

Even the form of the so-called monetary advances were

curious.  They were intercompany loans.  Then they were
recharacterized at different periods.  There's admitted
testimony that at all times CSC expected CEI to be able to
repay them.  Then when they were converted there are references
and documents, which I think Your Honor is aware, to the affect
that, well, there is no longer, we don't think that there's a
likelihood of repayment.

So there's no question that this was never conceived as a
measure of adequate capitalization.  If the Court were to find
CEI solvent during this period on this proof it wouldn't be
sending a message of comfort to the community.  It would
instead be saying that a parent can have this twilight zone
type of relationship with its subsidiary, not engage in any
dealings that indicate a binding obligation, or even indicate
that it would be terminated for periods of time.  But rather
simply be able to hold the illusion of capitalization out and
withdraw it whenever it wishes, all to the detriment of
Creditors.

How would you quantify capitalization this way?  What's
the capitalization to be measured against when the amount
that's to be given is utterly and solely discretionary without
recourse?  There's not a single reported case we have found in
which any Court has upheld a concept of adequate capitalization
here.  And since it's undisputed that the only way that CEI was
able to pay its debts was because of, and as a result of CSC's

funding, a funding that could have been terminated at any time, and was terminated after 2002, when various debts were not paid.

This would have far reaching ramifications, much more far reaching than a finding of insolvency in a situation where this company never made money and was clearly insolvent, clearly could not continue on its own.

And as for the reference to demonstrative Exhibit-2 and the lease termination costs, Mr. Lenhart clearly testified the documents clearly show that even if you were to make all sorts of adjustments down to the lease termination costs CEI was still adjusted balance sheet insolvent in every year.  It's not like this analysis or Mr. Lenhart's testimony is depended solely upon some legerdemain with the lease termination costs. Mr. Lenhart testified the -- his report clearly indicates that even if you were to use the bankruptcy cap of one year for the lease termination liability CEI's balance sheet insolvent in ever year any way.

            THE COURT:  I don't recall that testimony.

            MR. MANDELSBERG:  It's in his report, Your Honor, and I believe he did testify about the lease termination costs not being -- I believe it's in his report, for sure.

But it's also clear that Mr. Lenhart did not make any sort of adjustments to the balance sheets that were inappropriate or unreasonable.  The adjustments that he made either came from

the audited financial statements or reflect adjustments made
because of his conclusion that CEI was a failing concern.  The
adjustments to inventory for cost of goods sold are clearly
something that's reasonable and appropriate.  There was no
testimony to the affect that Mr. Lenhart was incorrect or that
was unreasonable to do.

So for all those reasons, Your Honor, and because we
believe that an appropriate decision on insolvency issues in
this case can only come after a review of all the evidence,
including the evidence that Defendants apparently are ready to
proffer in the form of their own expert, we think that the
Court should deny Defendant's motion and hear Defendant's case.
And we're confident that after doing that the Court will
conclude that CEI was insolvent during the relevant period.

Thank you, Your Honor.

THE COURT:  Thank you.

MR. WERDER:  Very briefly, Your Honor.  The procedure
obviously contemplates that the Defendants can move for a
judgment if the Plaintiff hasn't satisfied their burden of
proof.  That's what we're doing.

Three quick points.  Mr. Mandelsberg all but ignores our
reference to this Court's Lids case and this District's
American Classics case, which sets forth the standards.  He
does not discuss the Heckinger case.  There's two separate
issues that were presented in our motion.  Regardless of the

second issue, they haven't met the standard for not valuing on
a going concern, and it's clear that Mr. Lenhart only valued on
a going concern.

Mr. Mandelsberg attempts to suggest that Mr. Lenhart in
fact did a valuation on a going concern basis, which clearly he
didn't.  We established that yesterday afternoon when he
started to testify to it and I stopped him and said we didn't
want to get that in because it wasn't in his report.
Everything that he's done is on the basis of a failing concern.
And that's absolutely clear.

Next point is that Mr. Mandelsberg tries to suggest that
there was some sort of an analysis over time by Mr. Lenhart of
the funding issue.  And that's totally untrue.  He started from
day one with the absence of a binding commitment and he took
the absence of a binding commitment from day one as his basis
for finding failing concern.  There wasn't any attempt by Mr.
Lenhart to say, okay, let's look in June of 1998 and see what
the prospects are.  Let's look in December of '98, let's look
in June of '99, et cetera, et cetera.  The entire premise of
his conclusion with respect to the funding source is that there
isn't a binding legal commitment and that's clear at at least
10 places in his report, and it's clear again in his rebuttal
report.

Then let me just comment briefly on the two main cases
that Mr. Mandelsberg referenced, the RML case and the Doctor's

Hospital case. Both of those cases have nothing to do with
this case whatsoever. The RML case involved a Mellon
refinancing that didn't occur. And what the Court said is that
a financing that didn't occur can't be the basis for upholding
book entries that were actually made that without the financing
had no basis in reality when it was clear that the financing
wasn't going to occur. The key language in the opinion at page
156 is that {quote}, "A Debtor's creative accounting practices
which have the affect of grossly overstating its financial
condition can't be the basis for a Court's solvency analysis."
And that's what the Court said.

The other case, the Doctor's Hospital case, is basically
functionally the same. The expert in that case added $18
million to the book value of equity on the company's financial
statements on a post hoc basis for purposes of his solvency
analysis based on an assumption that the sole shareholder might
have or would have back in time two or three years ago, at the
period of time covered by the solvency analysis, made a
contribution which he didn't make.

So both of those situations involve an expert seeking to
adjust the actual balance sheet to reflect transactions that
wouldn't occur. I would characterize them as both sharing the
common feature that they reject efforts to base a solvency
analysis on a ship that didn't come in. Here Mr. Lenhart is
ignoring a ship that did come in to the tune of $500 million

over his testing period. Neither of those cases stands for the proposition that parent support of a subsidiary ought to be ignored for purposes of a solvency analysis if it's not given pursuant to a binding legal commitment. And that's what Mr. Lenhart clearly did as reflected both in his report and his testimony yesterday.

Thank you, Your Honor.

MR. MANDELSBERG:  Your Honor, just a couple of reply points.  First of all, we do believe Mr. Lenhart properly concluded that CEI was a failing concern.  The Lids case and ACD cases do not support a contrary proposition.  In fact, the ACD case which is ironically brought up by Defendants, is the very case decided in this Court which in an opinion in May, I believe, of this year criticized Defendant's own expert, Mr. Mandorino, for not performing appropriate analysis.  And it did not accord any significance to his opinion.  The ACD case does not lend support to the position that Plaintiff has not established its prima facie case.

As for the references to RML and Doctor's Hospital, we're not citing -- I think there is a fundamental disconnect about the funding issue here.  Plaintiff is not contending that the only thing that is required or looked to is whether or not there's a legally binding commitment.  That is not what Mr. Lenhart testified, and that's not what we need to do in order to satisfy our prima facie burden.

Mr. Lenhart looked, as is proper, at the financial
condition of CEI at points in time, fiscal year ending points.
The notion that CEI is somehow or was somehow solvent on
different points of time in the year but insolvent at least on
an adjusted bounds sheet basis because of this back end funding
is supported in none of the cases.

So the idea that you could be solvent, insolvent,
insolvent solvent because of this transitory, illusory funding
relationship is not supported by the cases. And the RML case
was cited by us not for the proposition that Mr. Werder
mentioned, but rather for the proposition that's noted on page
10 of our pretrial memo. And the point is how the Court was
trying to determine what a commitment letter's conditions were
before the bankruptcy filing. And in fact, they were going
back in time and trying to determine what to make out of this
commitment funding arrangement.

And the Doctor's Hospital case, yes, I realize it doesn't
involve a multibillion dollar company like Cablevision, but
that's not a point for distinction. It's directly on point.
It's an entity sole shareholder funding, and it deals with the
Court trying to wrestle the same issues here.

And just to point out the remark that we didn't deal with
certain adjustments, I do believe, as I said earlier, that Mr.
Lenhart's report does refer to the leasehold adjustment. But
even if you were to deduct 100% of the lease termination costs

on that demonstrative Exhibit-2 you'd still -- CEI would still be adjusted balance sheet insolvent. And I think Mr. Lenhart's testimony does offer support that it wouldn't be appropriate to just reduce those costs to zero.

In sum, Your Honor, I think what Cablevision wants to do here is not have the Court consider all the evidence, not have the Court consider Mr. Mandorino's testimony. I think the Court should in a certain sense I suppose there aren't a lot of disputed facts in this hearing, in this trial. Because many of them have been stipulated and many of the exhibits are received in evidence. But they are -- they do involve contrary expert opinions, and I think in this setting it is appropriate for the Court to hear both sides. We think more than enough evidence has been produced on Plaintiff's behalf to satisfy its prima · facie case. And the Court should rule after it hears all the evidence.

Thank you, Your Honor.

THE COURT: Well, while I usually agree with Plaintiff's statement that I should hear all the evidence I'm prepared to grant the Defendant's motion under Rule 52. I think that based on the evidence presented the Plaintiff has not met its burden of establishing that the Debtor was insolvent.

The case law states that in first determining or first applying the test we have to decide whether to use the going

concern or a failing concern or liquidation premise of value.
And I think the error was in not going with a going concern
premise of value.

The presumption is that an entity is to be treated as a
going concern unless bankruptcy is eminent.  And that's the
instruction we receive from the Moody vs. Security Pacific case
by the 3rd Circuit in '92.  "Where bankruptcy is not clearly
imminent on the date of the challenge conveyance the weight of
authority holds that assets should be valued on a going concern
basis."  The American Classic and the Lids case both applied
that reasoning.

It is not clear here during the period of time, or the
evidence does not convince me that from '98 through the end of
2002 that bankruptcy was imminent for this Debtor.  While it is
true that the Debtor had continuing operating losses, operating
losses alone are not a determinant of whether the entity is a
going concern or a failed concern, as Mr. Lenhart stated.

Once we -- I think the expert was required to consider the
fact that -- in 1998 was required to consider the fact that
Cablevision had purchased this entity out of bankruptcy in a
strategic acquisition.  It was reasonable therefore at that
time for management of the Debtor to believe that Cablevision
would in fact -- CSC I guess everybody's calling it, would in
fact fund the losses for a specific period of time in order to

enjoy or benefit from the synergies that it believed would come from the strategic acquisition.

In fact, CSC did fund the losses. In 1999 again it was reasonable for management to believe that CSC would continue to fund premised on the fact that budgets were reviewed, business plans were prepared and signed off by Cablevision. So it was reasonable to assume that again because it was a strategic acquisition that CSC would continue to fund the losses. In fact, CSC did.

By 2000 management not only had a reason to believe that funding would continue because of the hope for the synergies, but based on past practice. CSC had in fact funded the operating losses. In addition substantial capital expenditures were funded. One of the tests of whether or not an entity is a going concern is whether capital expenditures are being made, whether the company is expanding, whether employees are being added. All of these things were going on at this time. There was no evidence that cash was being restricted in any manner.

Again, by 2001 and 2002 CSC continued to fund the losses, continued to work with its subsidiary, continued to review and approve business plans. Even as late as July of '02 CSC reviewed the business plan that called for substantial additional funds to rehab certain stores, as well as close other stores, all with a purpose to achieve a benefit from the

strategic acquisition it had made in 1998.

I think the assumption that simply because a company has
operating losses it cannot be sold as a going concern does not
prove out in Bankruptcy Court. Many, many companies are sold
in Bankruptcy Court that have operating losses, and they're
sold for substantial sums of money. The evidence in this case
is that in fact CSC bought this entity out of bankruptcy and
paid a substantial sum of money for it. So it's not enough to
say that there are operating losses without the funding. I
think it was error for the expert to ignore the fact that CSC
in fact made funding and that it was reasonable to assume that
the funding would continue.

I also think that it was evidence of the intent to fund
can be found from the letter submitted to the auditors. While
they are not a legally binding commitment, they're a public
statement of CSC's intent and ability to fund losses. There
are no similar contemporaneous statements by anybody at the
Debtor or at CSC to indicate that that funding would not be
available and would not continue in the future.

And I think the caution against using hindsight is that it
would be improper for this Court to accept the testimony of the
CSC representatives who after the fact are now stating that it
was not a legally binding commitment, that they did not -- or
they could have withdrawn the funding at any time. That it was

not a statement of their intent to continue to fund for the
entire year that the letter covered.  I think that's the type
of hindsight that cannot be used to go back and evaluate
solvency.

I think what has to be viewed is from the point of
management of the Debtor at the time.  And I think through the
entire period from 1998 through the end of '02 it was
reasonable for the Debtor to assume that CSC would continue to
fund.  Especially since there were no statements that they
would not.  Notwithstanding there not being a legally binding
commitment, there was a public statement that they had the
intent and ability to fund.

So I think that it was reasonable -- it was not reasonable
to assume that the funding was not available.  With the funding
for that entire period of time it's evident that as a going
concern the Debtor was solvent.  The Debtor in fact had
adequate capital in the form of the advances by Cable -- CSC.
And in fact paid its debts as they came due.

While I haven't decided the admissibility of 71(A) I think
I can consider it, or the testimony elicited at cross
examination at least for the point that it appears that most of
the obligations incurred by the Debtor during '98 through 2000
where in fact paid.  Either from operating cash or from
advances by Cable.  And that the few that remain unpaid were

simply future obligations under a more than one year contract, or disputed obligations.

So it appears that in fact the Debtor was paying its debts as they came due, had adequate capital during the period and was solvent. I'm not prepared on this evidence to find that it was not solvent. I think the Doctor's Hospital and the RML cases are distinguishable. In fact, in RML the funding was not provided. And not only was it not provided, but the Court found it was not reasonable to assume that the funding would be provided because of the conditions placed on that funding, conditions which the Debtor itself knew it could never meet. In this instance there were no conditions placed on CSC's funding of the Debtor apparently. And in fact the funding was provided.

Similarly, in Doctor's Hospital what the Court was concerned or questioned was the fact that funding that was never provided was added back into a balance sheet after the fact. Again, the hindsight adjustment not based on what actually occurred.

So I'm not prepared to find on the evidence presented by the Plaintiff that the Debtor was insolvent from '98 through the end of 2002. Since the burden of proof is on the Plaintiff I think the Defendant need not go forward.

                    MR. MANDELSBERG:  Your Honor, I of course heard the

Court's ruling. I just want to make clear that the Court has considered particular evidence which is demonstratives 3 and 4, and Mr. Lenhart's testimony that I believe indicated that even on a going concern basis with the adjustments made to Mr. Mandorino's balance sheet they were adjusted balance sheet insolvent so that I understand Your Honor's decision about your conclusion --

THE COURT: Well --

MR. MANDELSBERG: -- that it was improper for Mr. Lenhart to conclude that they were not a going concern.

THE COURT: Well, I think that -- let me address that on this --

MR. MANDELSBERG: But I'm just -- I just want to make sure that the Court had considered that.

THE COURT: I did consider that. Yes, let me point that out. Let me address that, and thank you.

On demonstrable Exhibit-2 I think that the adjustments made because of the assumption that it was a failing concern, the adjustments made to inventory and property, plant and equipment were not proper. As a going concern the inventory can be sold at retail, which is above book value. So that I don't think any negative adjustment should be made for inventory. And a fact that appears that the Debtor until perhaps '03 was selling the inventory at retail.

With respect to the adjustment for the lease termination liability, again as a going concern there is no lease termination liability.  So there should not be any negative adjustment for that.

I think with those three items I agree that the adjustment to book value is not -- does not result in a negative, if we ignore those three categories.  But I think more importantly the fact is that there's no proof that the Debtor, even on a balance sheet basis, was insolvent, if I take out those adjustments.  I don't think I need to go to Mandorino's report and adjust up or down from that.  I think the -- my point is that there's a failure of proof, that there should be any adjustment to the balance sheet of the Debtors.

And certainly under the cash flow test or the capital adequacy test there's no evidence to suggest that the Debtor's insolvent.

MR. MANDELSBERG:  I think I understand what Your Honor is saying, but just so that it's clear, the record is clear that you've considered this evidence, we weren't only referring to Exhibit-2, but demonstratives 3 and 4, and my point in referring to it was to illustrate that the record, we believe, Mr. Lenhart's testimony established that even using Mr. Mandorino's adjustments which did assume that CEI was a going concern for all the years involved, the adjustments to

his numbers resulted in an adjusted balance sheet insolvency
for CEI for the fiscal years ending 1999, 2001, and 2002.  So
that we believe the testimony has established that even if it
is considered a going concern using Mr. Mandorino's own numbers
they are adjusted balance sheet insolvent for those years, and
therefore we believe that Plaintiff has established a prima
facie case of insolvency even if it's assumed that a going
concern model is used.  That's the only point I was trying to
--

          THE COURT:  I understand, but I think that again the
fact -- what's being ignored is the funding of the losses.  Mr.
Lenhart's assumption is that you must reduce the retail value
of the inventory because there are operating losses.  While not
considering that those operating losses are being funded -- in
fact were funded and were -- there was the public statement by
Cable that they would be funded.

     So I think it was reasonable to assume the inventory could
be sold at retail and should not be adjusted downward.

          MR. MANDELSBERG:  I know Your Honor's referred to the
public statements several times.  I'm not sure there's been any
evidence about this being a public statement, but I think I
understand what the Court is referring --

               THE COURT:  The audited financial statements.
               MR. MANDELSBERG:  Yes, Your Honor.

            THE COURT:  That=s my point.

            MR. MANDELSBERG:  And I just want to make clear that
the Court has considered in looking at exhibits --
demonstrative Exhibits 3 and 4 that Mr. Lenhart's testimony
adjusted them the -- these numbers for cost of sales, not
losses.  And they still resulted in adjusted balance sheet
insolvency condition for CEI for these 3 or 4 years as
demonstrative Exhibit-3.  I just want to make sure that the
Court has considered and understood that part of the testimony.

            THE COURT:  I do understand.  I'm not sure that
that's valid in a balance sheet analysis.

            MR. MANDELSBERG:  Thank you, Your Honor.

            THE COURT:  All right, where are we then?

            MR. WERDER:  Your Honor, the Defendants are prepared
to accept the conclusion by the Court that CEI was insolvent
during the statutory presumption period of 90 days prior to the
bankruptcy.  So if the Court is prepared to proceed that way it
appears that the outcome would be that the -- for the period of
the presumptive insolvency the going -- we can go forward in
the case with the conclusion that CEI was insolvent for that
90-day period and not insolvent for any other period pursuant
to the Court's oral ruling.

            THE COURT:  All right.

            MR. WERDER:  If I could just have a minute to consult

with my colleagues on one other issue, Your Honor?

        THE COURT:  Okay.

    (Pause in proceedings)

        MR. WERDER:  ` Your Honor, actually, I think Mr. Harner
points out that the Court's ruling covered through the end of
2002 is the -- as insolvency not being demonstrated, so it
actually would be probably like 75 days --

        THE COURT:  When was the bankruptcy, March what?

        MR. WERDER:  March 14th.

        THE COURT:  14th.

    (Pause in proceedings)

        THE COURT:  When was the last funding by CSC?

        MR. WERDER:  The funding continued into 2003, Your
Honor.  I'll give you the date.

        MR. MANDELSBERG:  Your Honor, I think there was
funding as late as March 5th.

        MR. WERDER:  We have March 4th, Your Honor.  It may
have been March 5th, but there's -- in 2003 -- there's pursuant
to Mr. Mandorino's report, Exhibit-3, there appear to be 20
fundings by Cablevision in 2003, totaling about $26 million.

        THE COURT:  Okay.  Okay.

        MR. MANDELSBERG:  Your Honor, in light of the Court=s
ruling I'm not sure how, if at all, the Court wants to proceed
with respect to the period of 2003 or the three months.  But --

THE COURT:  Well, I think they're conceding all
of '03.

MR. MANDELSBERG:  Okay.  Your Honor, will the Court
be issuing an order on this, and if so will it be certifying it
for interlocutory review?  Or would the Court like to review
any requests why it should do so or -- I mean, in terms of the
-- of where the ruling has in the case, as Your Honor will
recall, these two issues were supposed to be issues that
related to certain of the claims in the amended complaint,
namely the fraudulent transfer claims.

The idea I think of the parties was to try to see if those
claims could be resolved first before wasting time and expense
on litigating some of the other claims, which include claims
for breach of contract, promissory estoppel, misrepresentation,
and so forth.  It may be that some of the statements in Your
Honor's opinion would be relevant to those claims.  I'm not
sure.  But in any event it may also be useful before going
forward to be able to seek review of the ruling on insolvency.

So I guess what I'm asking is would the Court certify it
for review?  Would the Court wish to have formal requests --

THE COURT:  Why don't you make a formal request.

MR. MANDELSBERG:  Very well, Your Honor.

MR. WERDER:  Your Honor, the other issue that was on
for this hearing was the issue of the recharacterization of the

debt.  In light of the Court's ruling I don't -- and I think it
was on for this hearing because of the potential tie to the
solvency issue, we -- our proposal would be that we're not
gonna put on any evidence of that today, but to the extent that
in any subsequent proceedings here the Committee attempts to
recover against Cablevision on the GBO note we would like to
reserve the right to challenge the characterization of the GBO
note at such time.  But I don't think for today that that
appears to be necessary.

        MR. MANDELSBERG:  Well, I don't know that it -- it
may be that it's not necessary now.  But our view is that the
Court can decide that on the papers submitted in as much as I
believe all of the documents and all of the deposition
testimony submitted today provide a rather voluminous record of
who said what about these particular GBO assigned advances,
about -- the Court has all the documents that reflect or would
relate to the issue of what the parties intended this to be.
The Court has our memorandum setting forth what we believe the
applicable law is.

        THE COURT:  Well, I'm not inclined to decide it at
this point.  I don't know that it's necessary to decide it at
this point.

        MR. MANDELSBERG:  I understand that.  I'm just saying
that we do have the opportunity here --

THE COURT:  I don't think you have to reinvent the wheel.  If it becomes at issue at the trial.

MR. MANDELSBERG:  So the determination of that will be -- can be deferred to some point.  There are ramifications of that on certain of the claims.  For example not only the GBO claim but Cablevision's own intercompany claim in the amount of $8.9 million, which Your Honor will recall was objected to.  So it may be necessary to have that decided at some point.

THE COURT:  Let's wait and see  --

MR. MANDELSBERG:  Thank you, Your Honor.

THE COURT:  Decide it with everything else.  All right, I'll ask the parties to submit a Form of Order then.

MR. WERDER:  We'll do that.  Thank you, Your Honor.

THE COURT:  All right, we'll stand adjourned then, thank you.

UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

MR. MANDELSBERG:  Thank you, Judge.

(Court adjourned)


                          CERTIFICATION
I certify that the foregoing is a correct transcript from the
electronic sound recording of the proceedings in the above-
entitled matter.


_____            _____
Signature of Transcriber                    Date

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:                                          :
                                                :     Chapter 11
TW, Inc. f/k/a Cablevision Electronics          :
Investments, Inc.,                              :     Case No. 03-10785 (MFW)
                                                :
        Debtor.                              :
_____       :
The Official Committee of Unsecured             :
Creditors of TW, Inc. f/k/a Cablevision         :
Electronics Investments, Inc.,                  :     Adv. Pro. No. 05-50585 (MFW)
                                                :
        Plaintiff,                           :
                                                :
v.                                              :
                                                :
Cablevision Systems Corporation, *et al.*,      :
                                                :
        Defendants.                          :
_____       :

## ORDER

The Court having held a trial on November 29-30, 2007 (the "Insolvency Trial") on the "Insolvency Issue" (as defined in the Third Amended Scheduling Order entered on April 24, 2007 at docket number 157 (the "Third Amended Scheduling Order")), and having considered the evidence presented at the Insolvency Trial, and having heard argument from counsel, and after due deliberation, for the reasons stated on the record at the Insolvency Trial, the transcript of the proceedings of which are hereby incorporated by reference as the Court's findings of fact and conclusions of law,

IT IS HEREBY FOUND THAT:

1.      TW, Inc. f/k/a/ Cablevision Electronics Investments, Inc. (the "Debtor") was operating, and for solvency purposes, should be valued, as a going concern at all times during the period from February 9, 1998 through and including December 31, 2002.

2.    The Debtor is deemed to have been~~was~~ solvent during the period from February 9,

1998 through and including December 31, 2002.

3.    The Debtor is deemed to have been insolvent for the period from January 1, 2003

through and including March 14, 2003.

4.    A trial on the "Recharacterization Issue" (as defined in the Third Amended

Scheduling Order) is continued to a date to be determined by the Court. A status hearing
will be held on April 21, 2008 at 10:30 am.

5.    The Court shall retain jurisdiction to hear and determine all matters arising from

implementation of this Order.

Dated: March ___, 2008
        Wilmington, Delaware

                                    _____
                                    The Honorable Mary F. Walrath
                                    Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

**APPEAL TRANSMITTAL SHEET**

Case Number: _____  ○ BK   ○ AP

   If AP, related BK Case Number: _____

Title of Order Appealed:

_____

       Docket Number: _____          Date Entered: _____

Item Transmitted:  ○ Notice of Appeal              ○ Motion for Leave to Appeal
                 ○ Amended Notice of Appeal     ○ Cross Appeal
                 Docket Number: _____     Date Filed: _____

*Appellant/Cross Appellant:                 *Appellee/Cross Appellee

_____        _____

Counsel for Appellant:                      Counsel for Appellee:

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

*If additional room is needed, please attach a separate sheet.

Filing Fee paid?  ○ Yes   ○ No

IFP Motion Filed by Appellant?  ○ Yes   ○ No

Have Additional Appeals to the Same Order been Filed?  ○ Yes   ○ No
    If so, has District Court assigned a Civil Action Number?   ○ Yes  ○ No   Civil Action # _____

Additional  Notes:

_____

_____          By: _____
Date                                          Deputy Clerk

_____

                                    FOR USE BY U.S. BANKRUPTCY COURT

Bankruptcy Court Appeal (BAP) Number: _____
7/6/06